May it please the court, your honors, my name is Casey Arbenz and I represent Mr. Caldwell in addition to all out sewer and drain in this appeal. Your honors, the most significant issue in this case and really the issue that I believe several of the ultimate issues this court will decide in this case depend really on whether the government in this case was able to prove that the liquids that were discharged by Mr. Caldwell on the all out premises constituted pollutants. And in this case, your honor, the undisputed testimony was that these materials were essentially placed in a septic tank like situation where there was a liquid separation or a chemical change that is directly consistent with what goes on in millions of households in this country, including my own, every day in a septic tank, which is where discharges from a person's shower, a person's sink, and a person's toilet in a house go out into their yard into a tank and then a chemical process begins whereby the there are three levels of materials, liquid materials in that tank, the center level of which is made up of gray known in at least in that industry. In this case, your honor, the government proceeded to trial without a single sample or any type of measurement of what was actually discharged into the sewer port at the facility. The government's case relied solely on circumstantial evidence, but it wasn't even circumstantial evidence. It was actually speculative evidence. It was speculation as to what went down the drain because the only thing that the government tested was what was left in the tanks or in the hose. So Mr. Caldwell's testimony, in addition to the testimony of Mr. Dingus and others, was that only the gray water, that middle area of water or material was discharged into the sewer port. And without any specific measurement, the government simply never proved its case that an actual pollutant was thereby discharged into the sewer system. Now is there any expert testimony on this subject? No, although many of the witnesses who testified essentially were experts in the area in that they had worked in, you know, sewer pumping and sewer removal. I mean, they knew what went on in septic tanks and they testified to that. Right. And there was extensive testimony, and I hate to harken back to this, but there was extensive testimony about a person's drain field in their home and how there is this natural water that leaves every septic tank and goes out into a person's yard where it is in the groundwater, where when it rains, it potentially goes into the sewer system, which is where it ended up in this case, or goes into the Puget Sound or goes into rivers, goes into lakes. And so, Mr. Caldwell's testimony and the defense all along was just that, look, this was all that was ever discharged. It wasn't anything that constituted pollutant. Now that's an issue of his knowledge, and that may have given rise to a mistake of fact defense. But my opening argument here today, before your honors, is simply that the government never proved otherwise without a sample. Well, it's like, you know, that we're reviewing this now, of course, in terms of sufficiency of the evidence, and you don't need to necessarily have testing or expert testimony, correct? You say there's circumstantial evidence. Why wouldn't that be enough to glue that together and the jury decided based on those other gentlemen it heard? In looking back at my notes, your honor, I apologize. I said circumstantial. I actually meant speculative evidence, and I apologize for that because that's an important distinction in this case. Circumstantial evidence would potentially be enough to prove a case beyond a reasonable doubt consistent with this court's law and Supreme Court. I don't know what the argument was to the jury, but it seems to me the facts come down to something like this. What Mr. Caldwell operated was like a, wasn't it like a septic tank cleaning service? Correct. He'd go out and clean out septic tanks. Correct. And what you clean out from the septic tanks is not the gray water, but the sludge at the bottom. That's true. And he puts that all into his tank. Correct. So couldn't somebody assume that, well, what's in his tank is a lot more polluted than what's in, you know, the homeowner's septic tank? That's a great question, your honor. A couple of things. First, it was a bench trial. Secondly, indeed, what remained in the tank may have been a combination of all three in some process of the septic, you know, process. However, there was also extensive testimony about what happened once the material was pumped via a truck and then taken back to the all-out facility and that it was first screened. And this was undisputed testimony that the materials were, there's, I was there, there's an actual screen that the material was pumped through or hosed through that we didn't... You mean where it was pumped into the local district's pond. Is that what you mean? No, I apologize. You're talking about where the big items are taken out? Correct. So... But that doesn't take out the, I mean, it takes out shoes and... Right. You know, stuff like that, clothes, whatever just happened to go in there. And I'm just trying to give the court an understanding of the process. So the big materials are screened out and then that material goes into an underground two-chambered tank that was a rudimentary or, by definition, a septic tank. And water then would spill, gray water would then spill over into the second chamber as the biological process continued. And then that material was pumped into a larger 10,000 gallon septic tank. And then it was that material that was either, it went two places, either down the drain on the facility, but also, and this is underscored in our briefing, but essentially conceded by the government, millions of gallons of what was left, the sludge and the scum, those other more significant layers, were carted to the treatment facilities directly and the fees were paid there. So it was... But, Kel, so isn't there testimony from employees of All Out that Caldwell dumped tanks containing septage in their entirety into the sewer port? Well... And that the EPA actually tested the waste in the pump truck? That's true. And they did pump, they did test what was left in the tank, in the truck. And that's my argument, is they tested what was left behind. Mr. Caldwell testified that he only would discharge the gray water, the middle section of the tank. Well, what about Dingus, Mr. Dingus? Dingus, he did plead guilty. Mr. Caldwell did not. Mr. Caldwell asserted his right to trial. And Mr. Caldwell testified that he was careful and that what he believed he was doing was discharging the gray water, not the septic waste. And again, had the government gone down into this sewer port and taken samples, perhaps, and those samples had come back suggesting there were elevated levels of pollutants in that sewer port, then perhaps that would be the circumstantial evidence the government could rely on in proving this case. But by not taking a sample, there's just no evidence. We don't know what it was. It is entirely speculative and not even circumstantial. And this, the Fourth Circuit, there's minimal cases on this topic, because in most cases, we're not dealing with liquids. There is one case that's instructive, and that is the case, it's a Fifth Circuit case, United States v. Ahmaud, and in that case, a person owned a gas station, and some water had gotten into a tank that was also filled with gasoline. And Mr. Ahmaud, concerned that his tanks were contaminated with water, tried to pump the water out of the tank, knowing that gasoline's heavier, would be at the bottom, the water would be on top. Well, he was mistaken, and he pumped a dangerous mixture of gasoline and water into a local pond or something. Now, that case is significant for a couple reasons. One, the court recognized when you're dealing with liquids, it's a little different than if you're dealing with a solid that has known properties. Where liquids can change, and where the common experiences in our case are that liquids in a septic tank do indeed change based on the bacterias associated with them, that a person could very well assert a mistake of fact defense because those liquids do engage in a process of change. So this, to a large degree, that's the argument made at trial, and here's what the judge said. He says, although Caldwell testified the effluent was gray water, which is, I think, your argument, there's no doubt whatsoever the effluent poured into the sewer port on every date was a pollutant or pollutants consisting of, and then he talks about commingled waste, other contaminants, septage, grease rat, et cetera. And then he goes on to say, the court rejects as not credible the defense theory that the water was nothing more than what is known as gray water, consisting of water from domestic bathing and dishwashing. And then he goes on to explain how he got to that conclusion. So your argument, I understand, but how do you get by Jackson v. Virginia to say, you basically have to say, no rational trier of fact could find what this judge found. Right, and respectfully, Judge Settle believed the government's position, which is that once septic tank waste, always septic tank waste, and that simply wasn't the testimony. The testimony was that there is a change, and it's common sense. All of us, myself included, would be violating the Clean Water Act with our septic tanks in our yards if this court concludes that that middle section of gray water constitutes a pollutant. Again, Judge Settle relied on tests of what was left in the tanks without requiring the government to meet its burden by proving what was actually discharged. So respectfully, we would disagree with the judge's characterization of what the government was able to prove. I understand that, but he really kind of goes through this very carefully about gray water and why your client might have thought it was gray water, but here's why he knew it wasn't. And it wasn't like a one-time thing. He talks about a scheme to basically hide and do all kinds of things in the stealth of night. So I'm kind of hard-pressed on what to do on that claim unless you have some other either case or evidence that we should look to. I guess you're saying it's an absence of evidence. Correct. I mean, it's clearly a factual issue, so I've searched high and low, but there are a few cases that touch on this, and that's why I named the Ahmaud case. Another case that I think is instructive is the Fourth Circuit case of United States v. Shalem. In that case, the court did talk about the government's duty or requirement in a criminal case regarding violations of the Clean Water Act to, I guess, explain the makeup of what the actual pollutant was discharged. In that case, it was concrete or what they called shotcrete, and there were multiple witnesses who testified to what they witnessed and what they witnessed actually being dumped from a boat into the water. Again, in this case, the witnesses saw Mr. Caldwell back a pump truck up to the sewer port and put the hose down into the port, but nobody could tell you what actually went in there. And without that, it becomes a simple issue if you are buying the argument that these chemicals or these liquids do engage in a change. Your Honors, the reason I say that this issue is the most significant issue is because so much of what ultimately happened in this case as it gave rise to Mr. Caldwell's convictions for the other charges as well as the district court's sentencing was based on this overarching scheme as the government labeled it to engage in this action. However, I just would like to point out that if this court agrees that the government was unable to prove that a pollutant was discharged or that Mr. Caldwell engaged in the discharge of pollutants, that would mean that his convictions for alleged false statements would also be in question because much of or all of the questions relating to those charges were based on questions that were specific to pollutants. Again, Mr. Caldwell didn't conflate the terms pollutant and the term gray water as one and the same. Now, I would like to address also the convictions for mail fraud, and those are significant, Your Honors, for a few reasons. But most importantly, the timeline in this case as shown by the government in its case in chief showed that Mr. Caldwell was cooperative in his business practices, and he would go out and pump septic tanks, and then he would, you know, obviously create an invoice that was one copy was given to a customer, another copy was kept at his location, his office location. He would also fill out forms known as pumper logs that he would send to Callas County. Now, in 2000, I believe it was in 2010, Callas County began a practice of taxing the amounts of materials that were pumped at a six cent per gallon charge. Now, it was around that same time that Robert Menzia, who was a local official in the stormwater industry who began investigating Mr. Caldwell. Now, it's undisputed that Mr. Caldwell would ultimately alter his pumping logs, but that was not intended to be a scheme to collect unlawfully the six cent per gallon tipping fee. And this court will see that only amounted to about... But once those logs are put into the mail, doesn't that do away with your argument? No, because as has been stated by this court, in state versus, excuse me, government, U.S. versus Star, the government must show fraudulent intent and that the perpetrator contemplated actual harm. In this case, Mr. Caldwell was attempting to avoid administrative scrutiny. He wasn't out to bilk his clients. The grand total of that alleged mail fraud was about $10,000. So it was... Yeah, what about bilking the county out of the fees? Well, that wasn't his intent. It was... He believed that the materials that went into that stormwater drain were the same materials that mixed every time it rains here in the Puget Sound. So he knew he was paying fees for the amount he reported, right? That's correct. And he would definitely pay a fee. And he way underreported. Could you draw an inference that he intended to cheat the county out of those per gallon fees? Well, I think what he would say and what our defense is and was is that, no, that he was getting rid of the wastewater which goes down the drain. Well, that's a defense, but the jury doesn't have to believe that. That's true. But the government does have to meet its burden, prove beyond a reasonable doubt that what was actually discharged was a pollutant. We're talking about the... You're talking about the fraud. Right. You said he had to pay the per gallon fees on the number of gallons he reported. He did, but he didn't intend to defraud people. That's the question. Whether he intended it or not. And do you think there's sufficient evidence from which the jury could infer that he intended to defraud the county of the gallonage fees? No. I think he intended to conceal... I don't know what you think, but the evidence is there, isn't it? The evidence is there that he attempted to conceal and make the pumping match the dumping, but it wasn't there that he intended to defraud people of their six cent per gallon fee, because there was no evidence that he was looking to gain that $11,000 or $10,000. Your Honor, if I may reserve the rest of my time for rebuttal. Yes, you may do so, Counsel. Thank you. I have a question. Sure, you bet. Because I want to ask the government. There was one particular argument in your brief having to do with the loss amount and this kind of going back five years. Would you address that briefly and what you think the difficulty with that might be? Your Honor, the issue, I believe, and it's largely conceded in the government's brief under United States v. Riley, is that the government must show clear and convincing evidence that there's not a disproportionate result. And in this case, the difference is hugely disproportionate in that the $10,000 or so dollars associated directly with the mail fraud in terms of the tipping fee, if that amount was applied, then obviously there would be, I believe the sentencing range would have been four to ten months, whereby where Judge Settle applied this much more significant amount associated with the alleged losses to the utilities associated with what the government calls the larger tapestry of misconduct, it led to this hugely disproportionate loss amount that increased his standard range to 46 to 57 months. And the government didn't prove with clear and convincing evidence that that mail fraud led to that significant lost amount, and that's our argument. Thank you, Counselor. You may reserve the rest of your time. We'll hear from the government. May it please the Court, Charlene Kosky for the United States. Ms. Kosky? You hit on many of the points I'm going to make today, so I will make a couple in direct response to appellant's arguments. First, the government did not need to test the discharge from the hose, or that was actually discharged after it was discharged, because the evidence in this case is overwhelming. Mr. Caldwell hooked a hose up to the bottom of a 10,000-gallon tank that indisputably contained septic, industrial, and grease waste, where even under his theory, he was pumping the sludge that had settled to the bottom of the tank and discharging it directly into the public sewer system. Moreover, the government did test the contents of the pump truck Mr. Caldwell used to pump the waste into the sewer port, and the contents tested as septic waste. The evidence is also overwhelming that he knew he was handling a septic waste, and that's all that's required under Weitzenhoff. The septic tank's all-out pump contained everything that had been washed down a sink or flushed down a toilet. In pumping it, all of that septic waste mixed together in an all-out pump truck. The same tanks were used to haul grease, the grease waste, and later it would be mixed with industrial waste. Mr. Caldwell was a self-described expert on the septic business. He discharged from the 10,000-gallon tank into the port in the middle of the night in early morning hours so no one could see him. He'd used his truck to block view from the road and pump that waste from the bottom of the tank where, again, all the sludge settled. The witnesses described the contents of the 10,000-gallon tank as smelly brown sewage, septage, opaque, overwhelming in odor, with visible solids floating in it similar to watery oatmeal. Mr. Caldwell himself also testified that the contents of the pumped septic tanks and the 10,000-storage tank were septic waste. There's no question that the substance he discharged was a pollutant and that he acted knowingly. Regarding the case, Ahmad? Some of this water was tested, right? Mr. Caldwell did not test any of the contents of the tank. No, I mean somebody, the local district. Somebody tested some of the water, right? Like some of the water that was- They tested to see, they tested to confirm that the port led into the public sewer system. So they did a colored water test. They put dye in to see if it would go to the sewer pipe and confirmed that it did. And- The only test? No, they also tested the contents of the pump truck and that was done, I mean, they, that was like 20 minutes after they saw him pumping from that same truck and he confirmed that it was the truck. So there was that testing done and it was confirmed that the contents were septic waste. But he, he, I mean Caldwell, did he testify that what he pumped out of that truck was the gray water and he left that bottom part in the truck and that's what was tested? No, he testified that he pumped out of the bottom of the tank. And he also- I'm talking about the truck. Out of the truck, yes. So he did pump out of the truck, yes. And the video surveillance showed him pumping out of the truck. But you heard counsels tell us that he left the pollutants in the bottom of the truck and they were sent elsewhere. There was no evidence of that, actually. I think what happened is some of, all out did dispose of a certain amount of its septic waste properly. What's at issue here is the waste that it disposed of improperly. And that's the waste that they moved from the 10,000 gallon tank to the trunk and then into the port. And that's the waste that's at issue and those are the discharges that are at issue. There's never been any question that some of the waste was disposed of properly. What was the, did you try the case? No I did not. Right. Well, did you read the closing argument of the AUSA? I did. What was the basis for arguing that the, what he pumped into the local sewer system ponds was a pollutant? What was the argument on that? Well I think, well one of the, the point with what is a pollutant that goes in, what is a pollutant? The regulation at issue here required a discharge permit if the pollutants had been trucked or hauled. And at the point, everyone agreed that at the point the septic waste was pumped into the truck and it was taken to the all out company, it was trucked or hauled waste at that point and it needed to go through pretreatment standards before it could be discharged. So even when it was in the septic tank at the customer's septic tank before it moved to all out, it was still commingled waste. And one of the points I wanted to address was this insinuation that anyone who, when that, the waste water, which is not water as was the case in Ahmaud, it is a pollutant. It is, gray water is a pollutant. Even if that went into the groundwater, the Clean Water Act does not regulate groundwater. If you were to discharge that into a water of the United States, you would need a permit and it would be a violation of the Clean Water Act if you didn't have one. Well, what are you, what you're telling me, is that your own analysis or are you telling me what was argued to the jury? No, what was argued in the court, all of the evidence that supported that it was a pollutant, the contents of the septic tank included the description, the testimony that described it was actually in the tank, the process that it used in trucking or hauling it, which in which point it became a trucked or hauled pollutant, the testimony that there was grease waste also sometimes pumped into the trucks and later combined with the septic waste, that it was a mixture of septic and grease waste and then pumped into the 10,000 gallon holding tank along with industrial waste water, that some of that waste was then taken to treatment facilities, but most of it, 70% of it, was pumped out through a valve at the bottom of the tank where the sludge had settled into a pump truck and then onto the port, which fed the public sewer system, and on at least one occasion, Caldwell also pumped the septic waste directly from the 10,000 gallon tank to the port without using the pump truck. The waste was not treated before being discharged into the sewer system and it was not tested. Wasn't there some testimony that when the water in the pond was treated after Caldwell pumped the stuff in there, it didn't register any higher than it usually does or something like that? Oh, there was some testimony about, so under this, there's a case on point out of the Ninth Circuit and I'll talk about that briefly. I think if I understand your question correctly, you're asking about the contamination after it was treated and the fact that it tested as not contaminated might suggest that there was no harm. Right. But under Van Loban cells, this court recognized, and Van Loban cells looked at, this is in the sentencing context, 2Q1.2, which considers discharge or pesticides of hazardous waste, but it's parallel to 2Q1.3, which is the provision at issue in this case. The only difference is that under 2Q1.3, you don't have to have the hazardous waste element. But in that case, this court held that the point at which the contamination occurs is the discharge point to the sewer. That's as soon as the pollutant hits the public sewer system, there's contamination there and there's risk. So the fact that it goes through and it gets treated, that's not the point at which you measure contamination. I had a question that goes somewhat to that and to the specific evidence of when they found certain things happening, and that goes to this 14-point enhancement on the loss. It just seemed to me that, obviously, it had a huge effect on the sentence. It seemed to me that it's hard to see exactly how it was a reasonable estimate to just say, well, they've been at this for a long time, and therefore, because this is the estimate today, we're just going to go backward five years, we're going to add it all up, and we get ourselves within the $400,000 to a million. Well, okay. I think there was a lot of evidence supporting that calculation, but as a preliminary point, Mr. Caldwell also acknowledged in the restitution agreement that the actual loss caused by his at issue in the loss calculation. And the restitution agreement, the restitution must include only losses directly and proximately caused by the defendant's scheme. Loss rests on a mere estimation. Here, the district court looked at all-out invoices, which the government conservatively And that did not include grease or industrial waste or stormwater. It only included septic waste. Based on the treatment plant records, all-out properly disposed of about 1 million gallons of waste, leaving a balance of about 2.6 million gallons that were not properly disposed of. To find the loss, this is concerning the time period between 2008 and 2012, the court multiplied that 2.6 million gallons by the historic Three Rivers and City Longview rates, which were Agent Allen then testified during the trial that the loss associated with avoided disposal costs for that time period was about $307,000. The six cent surcharge fees were determined by comparing all-out invoices for septic pumping jobs in 2012, the pump blog submitted to the county, all-out collected $18,870 in surcharge fees, but only paid $8,208, leaving a balance out of $10,670. So the total loss for 2008 to 2012 was at least about $319,000. So the difference in that loss calculation for the years preceding 2008, we only need about $80,000 to get you to the $400,000 benchmark. And what the court did, it said, look, I'm actually not comfortable extrapolating that exact calculation out to those five years. But I do have enough evidence here that this scheme has been going on for at least 10 years that the business has remained essentially unchanged. He actually said there is no question that you at least get to the $400,000 mark. And under the guidelines, it was perfectly appropriate and required that the court require all related contact, all the relevant contact under USSG 1B 1.3. And so the relevant contact included the entire scheme, which was his pumping from 2001 forward. Thank you. If you don't have any questions, the government asks that you... No further questions. Thank you, counsel. Mr. Arbenz, you have some reserve time. Just in listening to the court's questions, I think an easiest way to sort of formulate an opinion or decision in this case is to think about the Ahmaud case and think about a case where there is a mixture of gasoline and water. And if the defendant were to then pump out the material and the government were to prosecute that person for violations of the Clean Water Act, I believe this court would indeed hold that the government needed to show beyond a reasonable doubt what was actually pumped, whether it was water or gas, recognizing that in that situation, everybody understands that there's going to be this liquid separation and a clear barrier between the two. Counsel, we heard that the government's view is that gray water itself is a pollutant. What's your response? I would disagree, Your Honor. Again, I think it goes against our... I don't think there's a specific definition that the government ever proposed at trial stating that. There were no jury instructions. Again, it was a bench trial. However, there's no body of law and they cited no cases stating specifically that gray water indeed is a pollutant. And again, that goes to our common experiences. If you have a septic tank, then you are violating and polluting by allowing your gray water or middle ground in your septic tank to go out into your drain field, out into your yard. Anybody in the Puget Sound would be contaminating the Puget Sound by doing that. And so that's not a pollutant. That is gray water. And if the government wanted to prove its case, it needed to test what was pumped. It needed to prove the total suspended solids amount. It needed to prove that there was a slug load. And I think that Your Honor brought up an important point, and I apologize. It looks like I have a little time, or maybe close. We've given you a little bonus of time. Go ahead. Okay. And I'll wrap it up, Judge. I believe... I can't remember which of you brought up the point about there was a measurement done after Agent Allen, who was the EPA agent on the case, believed he had observed Mr. Caldwell engaging in the dumping of pollutants. He called down to the Three Rivers Waste Facility and said, be ready. You're going to have what they call a slug load or a large uptick in pollution coming your way. And that never happened. And I asked specifically during cross-examination, Mr. Leaf, the superintendent, whether there was an uptick or a slug load on any of the days on or about the charged counts in this case. And he answered no each time. Was there an uptick in total suspended solids? No. Was there an uptick in pollution? No. Was there a slug load? No. Based on that, the government's case was entirely based on speculation. It was not based even on circumstantial evidence. By not taking a measurement, they're unable to prove their case. Thank you. Thank you, Counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Tashima, McKeown